**E. I. DU PONT DE NEMOURS AND COMPANY, a corporation, Libelant,**

v.

**PENNSYLVANIA RAILROAD COMPANY, a corporation, Respondent.**

Charles T. BANKS, individually and trading and doing business as Charles T. Banks Towing Line, Libelant and Cross-Respondent,

v.

**PENNSYLVANIA RAILROAD COMPANY, a corporation, Respondent and Cross-Libelant.**

Charles T. BANKS, individually and trading and doing business as Charles T. Banks Towing Line, Libelant and Cross-Respondent,

v.

**PENNSYLVANIA RAILROAD COMPANY, a corporation, Respondent and Cross-Libelant.**

Nos. 1724, 1754, 1759.

United States District Court
D. Delaware.

Oct. 10, 1958.

Alexander L. Nichols (of Morris, Nichols, Arsht & Tunnell), Wilmington, Del., and Carl E. Geuther, Wilmington, Del., of counsel, for libelant, E. I. duPont de Nemours and Co.

Alexander L. Nichols and William S. Megonigal, Jr. (of Morris, Nichols, Arsht & Tunnell), Wilmington, Del., George E. Beechwood and John V. Lovitt (of Beechwood & Lovitt), Philadelphia. Pa., for libelant and cross-respondent, Charles T. Banks.

David F. Anderson, William Poole, James L. Latchum and Hugh Corroon, (of Berl, Potter & Anderson), Wilmington, Del., for respondent and cross-libelant, Pennsylvania R. Co.

WRIGHT, Chief Judge.

## FINDINGS OF FACT

1. The three Admiralty actions under consideration were consolidated for trial and tried by the court on June 17–21 and July 8–10, 1957 (Docket).

2. The cases arise from a collision which occurred on August 3, 1953 between acid barge, Banks No. 8, being towed by the tugboat, "Grace Ann", upstream on the Christina River and Pennsylvania's R. R. bridge 2.27 which crosses that river (Pre-trial Order).

3. As a result of the collision the barge sank and was thereafter abandoned as a total loss (N.T. 310, 317, 1217–1218). In addition, there was a partial loss of the acid cargo, owned by E. I. duPont de Nemours and Company (duPont) then on board the said barge (LX 19; N.T. 802–803).

4. On September 3, 1954 duPont libeled the Pennsylvania R. R. (Respondent) seeking recovery for the partial loss of its acid cargo (Docket).

5. Charles T. Banks, individually and trading as Charles T. Banks Towing Line (Banks), on November 13, 1956 commenced suit in this court against respondent (No. 1754 In Admiralty) for loss of No. 8 barge (Docket).

6. On December 6, 1956, Banks also filed a libel against respondent in the United States District Court for the Eastern District of Pennsylvania, identical to that filed in this court as No. 1754. The Pennsylvania action was transferred to this court under the provisions of 28 U.S.C.A. § 1404(a), and was docketed No. 1759 In Admiralty (Docket).

7. By court order dated February 15, 1957 Banks was permitted to amend the libel in No. 1754 to allege matter purporting to excuse the delay in commencing the said action (Docket).

8. Respondent's answer to the duPont libel denies all allegations of respondent's negligence and affirmatively pleads, (1) that Banks was the sole cause of duPont's alleged loss, and (2), that if respondent were negligent, duPont was contributorily negligent (Answer).

9. The respondent has raised a number of defenses to the Banks' libels, namely, a general denial of any negligence, laches, non-joinder of an indispensable party and alternatively contributory or concurring negligence on Banks' part. In addition, respondent has filed a cross-libel against Banks for one-half of the damages, if any, which respondent may be required to pay duPont (Answer).

## Parties and Laches

10. Charles T. Banks was the sole owner of Barge No. 8 (LX 1; N.T. 633–635; see also statement of Proctor for Banks, N.T. 74).

11. Charles T. Banks Towing Line is a partnership consisting of Charles T. Banks and Flo Banks, his wife (N.T. 40–41).

12. Flo Banks, a partner of the Charles T. Banks Towing Line, is not a party to the libels filed herein (Banks' Libels).

13. The duPont libel concededly timely filed, raises the same issues respecting liability as those presented in the Banks' libels. (Respondent's Motion for Transfer—1759 In Admiralty—Allegation 3, wherein respondent's Proctor states: "3. There is presently pending in the District Court for the District of Delaware an admiralty action against respondent by the owner of the cargo lost in the same collision involving an identical question of liability captioned E. I. DuPont De Nemours and Company v. The Pennsylvania Railroad Company, No. 1724, In Admiralty.")

14. An extensive investigation of the collision was undertaken by respondent shortly after the incident (N.T. 1051).

15. The alleged delay in filing of the Banks' libels was excusable in view of the dissolution of the legal firm originally engaged by Banks and the uncertainty concerning which Proctors were to assume responsibility for prosecuting the cause (Stipulation; N.T. 1042).

16. Respondent has not demonstrated any prejudice from the alleged untimely filing of the Banks' libels.

## Liability

17. The collision occurred on Monday, August 3, 1953 at about 5:25 a. m. (Eastern Standard Time) at respondent's drawbridge, Bank 2.27 which spans the

Christina River in a generally north-south direction, at a point about 4.6 miles from its mouth (Pre-trial Order, par. 4).

18. The swing type drawbridge was under lease and control of respondent (Pre-trial Order, pars. 6 and 10).

19. The Christina River, where bridge 2.27 is located flows in a generally east-west compass direction (Pre-trial Order, par. 5c).

20. Approaching the bridge from the east (proceeding upstream) there are fender and piling systems on the north and south sides of the draw extending downstream from the bridge (LX 6; RX 5a, 5c; see diagram).

21. On the north side of the draw extending downstream is a spring rack, 94 feet 8 inches (LX 6; RX 5c; see diagram).

22. To the south of the draw is an immovable V fender which projects along the straight way of the draw downstream 44 feet 6 inches and then converges southerly to the apex of the V at approximately a 45 degree angle (LX 6; RX 5b; see diagram).

23. The opening of the draw at the narrowest point is 38 feet 8 inches (LX 6; see diagram).

24. The distance from the bridge to Newport (the destination of the tug and barge), is about 3.4 miles (LX 8; N.T. 353).

25. The depth of the channel varies according to navigation charts from 7 to 12 feet at low mean tide (LX 8).

26. Banks No. 8 was a wooden barge 112 feet long, 35 feet 8 inches wide (Pretrial Order, par. 5(e); N.T. 84).

27. The barge had a depth of 14 feet (N.T. 84) and when fully loaded drew about 10 feet of water (Respondent's Brief, p. 4).

28. She carried 10 acid tanks on her deck with a total capacity of 500 tons (N.T. 44, 742). On the day in question the tanks contained 452 tons of acid (LX 19), and the said barge drew between 7 and 8 feet of water (N.T. 338).

29. In negotiating the draw the barge had 6 to 8 inches on each side (N.T. 101).

30. The "Grace Ann" was a diesel powered tug of 77 gross tons (N.T. 50) with a 400–500 horsepowered engine (N.T. 334) which was controlled from the pilot house (N.T. 332). She was 79.2 feet long, 18 feet wide with a draft of 11 feet (Pre-trial Order, par. 5(e); N.T. 85, 331).

31. The channel as it approaches the bridge is approximately 200 feet wide (N.T. 346). Mean range of tides at the draw is 5 feet (N.T. 370; Pre-trial Order, par. 9). High tide at the mouth of the Christina on August 3, 1953 was at 6:10 a. m. (Eastern Standard Time) (LX 12).

32. On the date of the accident the tug "Grace Ann" was captained by Paul Burchard (N.T. 268). His line of vision from the pilot house was approximately 16 feet above the water line and exceeded the highest point of the center cribbing of the V fender (N.T. 333, 370–371; LX 10 G 14).

33. On June 24, 1953 more than one month prior to the collision in question, Banks' tug "Phyllis" towing Barge No. 8 while passing through draw 2.27 on its way to Newport, struck and damaged the V fender on the south side and also damaged the north fender (LX 15; N.T. 378–379, 725–730). At that time Captain Burchard and Captain Banks, the libelant, were aboard the "Phyllis" (N.T. 378–379, 725), and Captain Banks requested the bridge tender to have the fender repaired (LX 15; N.T. 378–379, 724–725, 728).

34. The Christina River was closed to navigation during July, 1953 for repairs to the Reading Railroad bridge downstream. The United States Army Engineers had been notified of the proposed repairs to the Reading Railroad bridge (LX 7A, 7B); accordingly, they published a "Notice to Mariners" that the river would be closed to navigation during July (LX 7C).

35. On July 31, 1953 repairs were commenced on the V fender (N.T. 1056, 1061). The cribbing on the channel side of the V was decayed and rotted (N.T. 1059, 1062). The timbers composing the cribbing were removed, preparatory to replacement (N.T. 1057) and by the end of the working day on July 31 one new timber had been inserted on top of the pilings at the bottom of the V (N.T. 1058). No further work was done until sometime after the collision (N.T. 1059). The removal of the cribbing left an opening in the channel side of the V fender 17½ feet long by 9 feet high (LX 6, 10 G 14; N.T. 1074).

36. Respondent did not notify the United States Army Engineers of its intention of tearing out the cribbing nor was notice given to navigation (N.T. 290, 422, 431, 494, 521, 528, 529–530).

37. Respondent knew that the repairs would not be completed before resumption of commercial navigation on the River commencing August 1, 1953 (LX 7C; N.T. 1058).

38. The removal of the cribbing exposed submerged longitudinal beams (N.T. 423, 568–569). No warning signs

or signals were placed on the bridge (N.T. 422, 431, 529–530, 569).

39. Respondent was aware that the Banks line made extensive use of the draw (LX 15).

40. Banks was not forewarned nor did he have prior knowledge of the initiation of repairs to draw 2.27 or of the removal of the cribbing (N.T. 290, 422, 431, 494, 521, 528–530).

41. On August 3, 1953 the "Grace Ann" was towing Barge No. 8 upstream stern first (N.T. 268–271). The tow was on short hausers with a distance of 6 to 8 feet between tug and tow (N.T. 269–270).

42. The vessels approached the bridge on a flood tide (LX 12; N.T. 267) which had been running approximately an hour and a half at a speed of about $2\frac{1}{4}$ miles per hour (N.T. 283, 347, 349).

43. As the tug approached the draw, Captain Burchard signaled the vessels' presence for the bridge to open, and then slowed down to slightly more than the speed of the tide, just sufficient to maintain proper steerage (N.T. 283).

44. Captain Burchard proceeded toward the draw in an arc from the south; cross currents cutting to the north (N.T. 286, 360–366, 522).

45. At a distance less than 200 feet the Captain observed that cribbing on the channel side of the V fender was missing (N.T. 291), but he was then too close to swing the vessels around (N.T. 310).

46. In negotiating the draw the right corner of the barge glanced off the north spring rack and rebounded to the south fender system (N.T. 393, 423, 522). Captain Burchard attempted without success to avoid the protruding timbers by turning "Grace Ann's" rudder hard left (N.T. 310). The left leading corner of the barge struck the exposed longitudinal timbers which punctured the barge's hull, starboard side, and caused her to sink within minutes after the collision (N.T. 310, 393, 423–424, 429, 494, 522).

47. In view of the set of the tide and the narrow clearance it was necessary for the barge to strike both fender systems to properly navigate the draw (N.T. 710–712, 717–718).

48. The method employed by the tug and tow in negotiating the draw was the method followed by Banks and his captains for years without mishap (N.T. 309, 405–407, 410–417, 421, 526, 1241).

49. The log of the draw from 3/1/52–8/3/53 discloses that the bridge almost exclusively (except for small pleasure craft) opened to accord passage to Banks' vessels. Hence the method employed by Banks and his captains is deemed particularly relevant and must therefore be denominated as the usual procedure followed (LX 15).

50. Respondent knew that the barge always passed through the bridge in this manner, i. e., using the cribbing as an aid in effecting passage (N.T. 710, 712, 718), yet afforded no warning of the hazardous condition of the cribbing (N.T. 422, 431, 494, 528–529). By opening the draw respondent in essence invited passage (N. T. 553).

51. None of the libelant's officers or crew knew of the missing cribbing or could see the dangerous condition until it was too late to avoid the collision (N.T. 290, 291, 324, 422, 498, 521, 523).

52. The weather was clear and visibility was good (Pre-trial Order, par. 5d).

53. Captain Burchard made no effort to ascertain the condition of the fender on the date in question (N.T. 380).

54. The angular approach employed by Captain Burchard and Banks conforms to the contours of the channel. Directly opposite the entrance to the draw a short distance downstream is an island which renders a direct approach to the draw difficult by vessels this size (Court view; LX 8).

55. The barge although not in prime condition was nevertheless seaworthy and was capable of performing the services required (LX 4, 5; N.T. 61, 93, 760, 1184).

### Banks' Damage

56. Banks' barge No. 8 was a total loss and was abandoned (N.T. 1206–1221).

57. In 1947 Banks purchased Barge No. 8 from duPont for $5,000 (LX 1; N.T. 62, 130).

58. The sale was accompanied by an agreement whereby the barge was chartered exclusively to duPont for five years at $11,400 per annum. The charter did not contain an option to renew (LX 2).

59. On March 1, 1952 the agreement was extended for an additional five years. At the time of the collision the charter had approximately 43 months to run (LX 3).

60. Banks' books of account were maintained on an archaic single entry basis (Banks' Brief, p. 29; N.T. 575) which were incapable of affording accurate measures of certain items relied upon in presenting Banks' damage claims (N.T. 572–575, 584, 602–603, 679–685, 945, 951–952, 959–960, 964–965, 970–971, 982, 985, 989–990, 992, 1010–1013, 1015–1021, 1022–1035).

61. The bulk of repair work on Barge No. 8 was performed by Banks' Yard (LX 41A, B; N.T. 605). The records maintained did not accurately portray compensable expenditures by job (N.T. 602–603, 680–685, 945, 951–952, 959–960, 964–965, 970–971, 976, 1015, 1022–1032, 1034–1035).

62. The amounts claimed to have been expended from 1947–1953 follow:

"Repairs on Barge No. 8

| | |
|---|---|
| 1947 | $4,092.40 |
| 1948 | 830.17 |
| 1949 | 1,630.67 |
| 1950 | 107.41 |
| 1951 | 746.91 |
| 1952 | 4,201.38 |
| 1953 (mostly July) | 15,925.23 |
| Total | $27,534.69" |

(Banks' Brief, p. 29).

63. To reproduce Barge No. 8 in 1953 according to respondent's expert would cost $54,000 (N.T. 1139). Banks offered no creditable testimony to rebut this figure.

64. A steel barge of like proportions in 1953 could have been purchased new for $133,000 (N.T. 122).

65. Libelants (Banks and duPont) produced no evidence, documentary or otherwise, save that it was old, fixing the age of the hull and tanks (N.T. 147–149, 155–156, 754, 768). Respondent's expert stated that the hull was about 40 years old (N.T. 1139).

66. Mr. LaMotte, an employee of duPont, based upon an inspection made in March, 1951 of Banks' Barge No. 8 estimated the remaining useful life of the tanks to be 10 years (N.T. 770).

67. Witness Fletcher, a carpenter foreman employed by the Noeker Shipyard called by Banks stated in his opinion, founded upon observation of the hull in July, 1952 the remaining life would be approximately 10 to 15 years from the July, 1952 date (N.T. 931–932).

68. No testimony was adduced pertinent to any scrap or residual value the hull and tanks might have.

69. Respondent's expert stated that the tanks new would have a useful life of 20 years. In his opinion they were 16 years old at the time of the collision (N.T. 1139).

70. The cost new per tank in 1953 was approximately $4,000 (N.T. 763).

71. Price quotations and dimensions of hulls available in 1953 were as follows:

| Dimensions & Description | Price |
|---|---|
| Steel deck scow, tapered bow and stern, good condition—125' x 30 x 9 capacity 500 ton weight cargo | $12,500.00 |
| Five wood scows in need of repairs approximating $4,000–6,000 each, 110 x 33 x 9 Age 26–28 | 4,000.00 each |

The above information was testified to by Frederick Smith a ship's broker contacted by Banks in 1953 for purposes of replacing Barge No. 8 (N.T. 1146–1153).

72. The quotation of the aforementioned hulls held for sale by the Maxwell Harris Co. does not include conversion costs necessary to fit the vessels for tank carriage. There was no testimony adduced pertaining to the costs required to adapt an ordinary barge for tank purposes (N.T. 75, 1150–1151).

73. Banks was the sole opinion offered to substantiate his claim. He stated that the hull and tanks were worth $50,000 on the date of purchase, January, 1947 (N.T. 70) and $65,000 in August, 1953 (N.T. 116).

74. Respondent's expert, Captain DeMars, a ship's surveyor and appraiser valued the hull of the barge on the basis of an estimated reproduction cost less a 5% progressive depreciation by the Martin scale plus an additional depreciation factor at $2,966, and valued the acid tanks and fittings on the basis of an estimated reproduction $27,332 less a 5% straight depreciation at $5,466. Therefore, on the date of loss the barge with tanks according to witness DeMars was worth $8,432 (N.T. 1138–1140).

75. Current sales of comparable vessels did not enter into DeMars' (N.T. 1142), or Banks' determinations (N.T. 116–118).

### DuPont's Damages

76. At the time of the acid loss, Banks and duPont were operating under a charter dated March 1, 1952 (LX 3).

77. DuPont reserved no control over the navigation and handling of Banks' Barge No. 8. Banks was absolute owner of Barge No. 8 and manned, victualed and navigated the said barge (LX 2, 3; N.T. 96–97, 114–115, 748–749).

78. As a result of the sinking of Barge No. 8, 539,152 pounds of 71.98% acid were lost. In terms of 100% acid the loss is 388,082 pounds or 194.041 tons (LX 19; N.T. 802–803).

79. DuPont expended $2,845.67 for salvage expenses and barge rental (LX 18; Respondent's Brief, p. 10; N.T. 781).

80. The sulphuric acid lost was 71.98% strength equivalent to approximately 56½° Baumé (N.T. 784–785, 790, 810, 832) and suitable for commercial applications (N.T. 822–823).

81. The acid at the time of the collision was being transported from the duPont Repuano works at Gibbston, New Jersey to the duPont Newport plant at Newport, Delaware to be used in duPont's lithopone manufacturing operation at Newport and was not intended for resale (LX 14; N.T. 267, 781, 792–793, 799–800, 804, 807–808, 815–816).

82. On August 3, 1953 the quoted price in this area for technical quality sulphuric acid was $23.95 per 100% basis ton of 2000 pounds (N.T. 837, 842; LX 20, 21, 22).

83. Acid of the same strength and quality lost was sold by duPont from its Repuano plant in the latter part of 1953 under a special requirements contract at $18.58 per ton 100% basis (Answer to Interrogatory No. 8 filed 6/14/57; N.T. 853–855, 857).

84. The sulphuric acid available in the market most nearly corresponding in strength and quality to the lost sulphuric acid was 60° Baumé, which is equivalent to 77.67% strength technical quality acid (N.T. 790, 847).

85. The 60° Baumé sulphuric acid could have been used in duPont's operation interchangeably with the lost acid without additional equipment or expense (N.T. 821–822, 844).

86. The fair market value of the lost acid on August 3, 1953 was $23.95 per ton 100% basis, total sum for 194,041 tons lost, $4,647.28.

In view of the nature of the proceedings and the complex issues raised a few observations are deemed appropriate.

### Liability

■■ The Christina River was closed to navigation during the month of July,

1953 by the United States Army Engineers to permit the Reading Railroad to repair its bridge spanning the Christina at a point between the mouth of the River and respondent's draw 2.27. Although respondent had been apprised that the V fender of draw 2.27 was in disrepair, respondent did not avail itself of this opportunity to institute the needed repairs. Instead, it waited until July 31, 1953 one day before navigation was to be resumed to commence work on the fender system. The repairs could not be completed on that day. The respondent knew navigation would be resumed on August 1, 1953.

On July 31 the entire cribbing was removed preparatory to replacing the rotted timbers. By the end of that working day only one new board had been inserted. Failure to replace the remaining cribbing exposed longitudinal timbers some of which were submerged and accordingly created a hazardous condition to mariners. Permission for conducting these repairs was not secured from the Army Engineers nor was any notice or warning of the condition accorded navigation. The situation remained unchanged on August 3, 1953 the date of the collision. The sinking of Banks' Barge No. 8 resulting directly from striking the exposed longitudinal timbers after the draw had been opened inviting passage, and with knowledge that large vessels enlisted the fender system as an aid in negotiating the draw and no notice of the imminent threat appearing, respondent must be cited for imprudent and negligent conduct.

Moreover, the court cannot subscribe to respondent's contention that Banks should be charged with contributory or concurring negligence for improper navigation. Employment of an inexperienced captain, an improper approach, failure to notice the missing cribbing, and unseaworthiness of the barge among others are specifically noted as evidencing this conduct.

The log of draw 2.27 discloses that it was seldom opened except to afford passage to Banks' vessels. Particular significance must therefore be attached to the techniques employed by Banks and his captains in determining whether the instant approach was proper. The proof adduced demonstrates conclusively that Captain Burchard conformed to the method successfully used by the Banks line. Accordingly, negligence cannot be imputed on this count.

Respondent's contention of failing to notice the missing cribbing is similarly deemed of little merit. To buttress this view respondent points to the fact that Captain Burchard was present when Banks on June 24 notified the bridge tender that the fender system was in need of repair.

The contention would be much stronger if the collision resulted from the deteriorated condition of the fender. This, however, was not the case for it was in removing the cribbing thereby exposing longitudinal timbers that was the efficient proximate cause of the damage. Under this factual setting it would indeed be unreasonable to hold that Captain Burchard should have anticipated removal of the entire cribbing. The fact that the Christina had been closed for the specific purpose of bridge repairs during July and the fact that the draw opened inviting passage without warning of the perilous condition disclosed the inadequacy of respondent's contention.

The question remains whether Captain Burchard was negligent in not noticing the missing cribbing despite the fact that the weather on August 3, 1953 was good and visibility was clear. The court is unable to conclude that the missing cribbing should have been sighted in sufficient time to halt the vessels prior to entering the draw. The evidence reveals that the tug and tow approached the draw at an angle from the south. The northern part of the V fender was therefore somewhat obscured. Under these circumstances an initial sighting approximately 200 feet from the bridge entrance, a distance too close to avert the danger, was not the exercise of imprudent conduct. The opening of the draw without warning in full knowledge

of the fact that the tow would make use of the fender system is a factor which must be evaluated in considering the alertness of Captain Burchard and his crew. Clearly, if warning had been given this issue would be considered in a different light.

Unseaworthiness of the barge is next cited as relieving respondent of part of its responsibility. The specific finding of the court that the barge although not in prime condition was capable of performing the services for which it was exclusively engaged is dispositive.

There remains the matter of Captain Burchard's inexperience in navigating the Christina coupled with the fact that he was not a licensed pilot. Having found that the Captain piloted the vessel in the accustomed manner makes these averments totally irrelevant to the issue.

In conclusion, the court finds that respondent's acts were the sole proximate cause of the barge's demise and accordingly must answer in damages for the injury caused. See M. P. Howlett, Inc., v. The Catherine Carroll, D.C.E.D.N.Y. 1944, 56 F.Supp. 466.

### Banks' Damages

The assessment of damages has caused the court much concern. Banks' claims (1) fair value of the barge; (2) loss of barge profits and (3) loss of towing profits. These items will be discussed seriatim.

(1) Fair value of the barge. The proof adduced pertaining to the market value of Barge No. 8 on August 3, 1953 leaves much to be desired. Only Captain Banks testified on the issue in his case. The considerations encompassed in Banks' computation do not accord with the generally recognized standards. See Standard Oil Co. of N. J., v. Southern Pacific Co., 1925, 268 U.S. 146, 45 S.Ct. 465, 69 L.Ed. 890; Carl Sawyer, Inc., v. Poor, 5 Cir., 1950, 180 F.2d 962. In addition, the books of account of the Banks' enterprises concededly archaic were incapable of extended reliance. Banks valued the barge at $65,000.

Respondent countered by presenting one expert who proffered a valuation of $8,432. It is important to note that De-Mars based his valuation on a singular standard, namely, reproduction cost less depreciation.

In view of the sparsity of evidence, the court has searched the record for all proof bearing on the issue and has set them forth in its findings. From an evaluation of the testimony and exhibits certain observations are noted.

Respondent concedes that the fair market value of the hull with tanks was in excess of the original sale price of $5,000. The record, however, does not support Banks' contention that he received a favorable purchase price from duPont because he chartered the barge back to duPont at a rate far under the market; hence the entire package—sales, charter—towing agreements must be considered pari materia. The absence of an option clause in the original instrument and the subsequent renewal of the charter at the identical rate of hire provided for by the first instrument demonstrates that the $11,400 per year was a fair hire. Since Banks was not compelled by the original contract to renew, the monetary consideration under the new charter can in no manner be deemed dependent upon the original sale price. Other avenues must therefore be pursued to arrive at a fair valuation.

Banks' Barge No. 8 was equipped with ten tanks. The court credits the testimony which established a reproduction cost of these tanks in 1953 at $40,000 for the entire complement. The age of the existing tanks was unknown but an inspection by duPont on March 13, 1951 estimated that they had a remaining useful life of about 10 years. Respondent's expert in forming his calculations pertinent to the tanks used a 20 year depreciation factor applicable to 1953 reproduction costs.

In August, 1953 approximately $2\frac{5}{12}$ years had expired since the 1951 duPont inspection; hence $7\frac{7}{12}$ years remained based upon the 10 year estimate. Employing a 20 year straight line deprecia-

tion factor or 5% per annum, the reproduction cost ($40,000) less 12⁵⁄₁₂ years depreciation would be $15,167.

The only direct opinion testimony fixing a value on the tanks as a distinct item was that of respondent's expert. Captain DeMars approximated the value based upon a reproduction cost of $27,332 at $5,466. Since the court has credited a reproduction variable in conflict with Captain DeMars, the resulting computation is rejected and the figure of $15,167 is deemed the fair value of the 10 tanks as of August, 1953.

With respect to the hull, the measure of value believed most representative is the 1953 prices of comparable available used hulls. The I. C. White, 4 Cir., 1924, 295 F. 593; [1] Texas Co. v. R. O'Brien & Co., 1 Cir., 1957, 242 F.2d 526. A member of the ship's brokerage firm of Maxwell Harris Co. stated he had replied to an inquiry from Banks in 1953 that a steel barge in fine condition measuring 125′ x 30′ x 9′ with 500 ton capacity and specially suited for the designated purpose was available for $12,500.

Although Barge No. 8 was peculiarly adapted for the services engaged in, Banks has failed to prove it was sui generis. The I. C. White, supra.[1] The

---

1. Particularly relevant is the language appearing at pages 595-596 of the opinion wherein the court states:

"In awarding damages, the aim is to put the injured party back in the pecuniary position he occupied before the wrong was done. If property has been taken away from him, he should have it or its equivalent restored to him, if that be possible. If things of the kind he has lost are being freely traded in, so that he can go into the open market and buy them, the fair measure of what he should receive is the sum which would purchase articles of the character, quantity, and quality of those taken from him. It is ordinarily so much easier to apply this method of measuring damage, and it is so much less likely to do injustice, that the law insists that it shall be used whenever possible. It governs, not only in the case of standardized commodities, but in such things as ships, in which, perhaps, no two were ever precisely alike, although there are numerous types, the differences between the individual specimens of which are relatively unimportant.

\* \* \*

\* \* \* \* \*

"We are not persuaded the commissioner was right in concluding that the construction of this schooner or the use to which she was put was so out of the ordinary as to make altogether irrelevant evidence of the market value of other craft of the same general class employed in the same trade. In many ports which schooners have occasion to visit the water is relatively shallow. Deep-draught ships cannot enter them, and yet, other things being equal, there is economy in using vessels of large carrying capacity. For sometime, therefore, schooners intended to trade at such places have been built with comparatively flat bottoms, as was the Pendleton. Vessels so constructed are liable to certain strains, to which others of more ordinary build are less subject. In order to guard against this source of weakness, the schooner with which we are concerned had been built of unusually heavy timbers. She had a strongly reinforced keelson. She had a fore and aft center line of truss or bridge work, consisting of a stringer reaching from stem to stern post, immediately under and supporting the deck beams, and supported in turn by vertical stanchions diagonally braced and resting on the keelson; the whole forming a system of bridge work from deck down to keelson and extending throughout the length of the ship. She was also supplied with heavy internal reinforcement at the turn of the bilge.

"All of these things made her a stronger vessel, and one perhaps better adapted to the successful prosecution of the trade in which she and countless others less substantially built were engaged. She was not put to any peculiar use. If she had been offered for sale under ordinary conditions, there would have been a market for her. If the features in which she differed from other schooners of her size were of real value to her, in the judgment of those engaged in the trade, that extra worth would doubtless have been reflected in the price she would bring. The owner of the lost vessel could not, it is true, in the market find another precisely like it; but he would be able to get one of a kind which other people had been able profitably to use in the same trade. In such event, we think he would be entitled to· such sum as such other ship would cost in the market, plus an adequate allowance for the superior worth

evidence adduced indicates that the questioned steel hull could have been fitted for tank service and employed on the Christina. Banks did not rebut this testimony to the court's satisfaction.

The record also discloses that the brokerage firm had 5 wood scows not unlike the Banks hull save for absence of tanks. They were quoted at $4,000 each; however, $6,000 in repairs was needed to place the ships in seaworthy condition.

Under these circumstances the court concludes a suitable replacement for Barge No. 8 could have been procured and that the measure of recovery for the hull will be limited to $12,500, the price of the barge in 1953 immediately conditioned for service.

It is realized to fully compensate Banks under this method a sum should be permitted for fittings with respect to installation of tanks. The record being void of any proof pertinent to this factor an allowance for the item unfortunately cannot be granted. Consequently, Banks' award is restricted to a sum reflecting the value of the hull and tanks, $27,667.

This amount is deemed to conform with the realities and well settled valuation principles so far as the inadequate record permits their application. First it falls somewhere between respondent's and Banks' respective estimations. Moreover, it is deemed to reasonably approach a proper allowance for repairs performed on the hull according to Banks' submitted figures plus the original purchase price. Finally, Barge No. 8's income value for its remaining useful life—stated in 1952 to be 10–15 years, assuming no salvage, discounted to present worth compares favorably with the $27,667 determination.

■ (2) Loss of Barge Profits. No sum is awarded for this claim for several reasons. First, the court finds a suitable replacement could have been procured. In addition, since Barge No. 8's value lies chiefly in its hire potential, the current value should reflect its earning capacity. Thus, in a total loss case there is a distinct problem in awarding lost profits, for a double recovery might result. Lastly, the Second Circuit in a well reasoned opinion has unequivocally held lost earnings under an existing charter non-compensable in a total loss collision, Ozanic v. U. S., 165 F.2d 738, 743.

The recent Third Circuit pronouncement cited by Banks is inapposite for there the court was confronted with contractual and not tort measures. See Gardner v. The Calvert, 3 Cir., 1958, 253 F.2d 395.

(3) Loss of Tow Profits. In addition to the reasons enunciated pertinent to lost barge profits, the court in rejecting the claim notes:

(a) Banks' claim is not encompassed in the libel; and

(b) under the circumstances the item would be too remote and highly speculative.

### Laches

■ The court will not invoke the harsh doctrine of laches to preclude recovery by Banks. The record discloses that the duPont libel was concededly timely and encompassed the precise proof relevant to liability as the Banks' claim. Further, respondent immediately after the collision exhaustively investigated the incident. Indeed, the trial of the cause is the best evidence respondent suffered no prejudice from the alleged delay in instituting the Banks' libel.

Moreover, Banks has satisfactorily exhibited that the late filing was the product of excusable neglect occasioned by the dissolution of the original legal firm libelant engaged to prosecute the cause.

The aforementioned holding of excusable neglect—nonprejudice obviates determining the period of limitation applicable with its concomitant choice of law problem. See Czaplicki v. The Hoegh Silvercloud, 1956, 351 U.S. 525, 533–534, 76 S.Ct. 946, 100 L.Ed. 1387; Gardner v.

---

of his ship which was destroyed, as shown in her unsual capacity to earn a net income and the probability of her longer life, if such factors can be determined with reasonable approach to accuracy."

Panama R. Co., 1951, 342 U.S. 29, 72 S.Ct. 12, 96 L.Ed. 31; Loverich v. Warner Co., 3 Cir., 1941, 118 F.2d 690; Seaboard Shipping Corp., v. The Phyllis, D.C.E.D.Pa.1956, 146 F.Supp. 892; and Walle v. Dallett, D.C.S.D.N.Y.1955, 135 F.Supp. 390. Accordingly, the court takes no position on this point.

### DuPont's Damages

DuPont's damages have all been conceded save for the appropriate market price to be applied. Respondent claims that the acid lost was a residual product and therefore should be valued at $18.58 per ton 100% basis which is the amount duPont received for sulphuric acid of similar quality to that destroyed under the provisions of a requirements contract negotiated with the I. P. Thomas and Son Co., in 1953. DuPont counters that it is entitled to the fair market value in August, 1953 quoted by various chemical concerns in the area of $23.95 per 100% basis. The uncontradicted record discloses that the fact the acid was a residual product neither affects its quality nor price. The acid lost was to be used by a duPont division and was not held for resale.

Against this background, the court holds that duPont is entitled to the prevailing market price quoted by local chemical concerns for acid suitable to replace that lost. The figure adopted is $23.95 per ton 100% basis. Accordingly, duPont is awarded the full amount of its prayer, $7,492.95 computed as follows:

Acid lost—194.041 N.T.

| | |
|---|---|
| at $23.95 N.T. | $4,647.28 |
| Salvage expenses | 547.00 |
| Barge rental, twg., etc. | 2,298.67 |
| | $7,492.95 |

### Interest

The court in the exercise of its discretion concludes that the delay in filing Banks' libel, although not a bar to recovering the principal amount in dispute, precludes Banks from receiving interest commencing with the date of the collision. Interest on Banks' cause will run from the date of the filing of the libel in No. 1754, to-wit, November 13, 1956. Pennsylvania R. Co., v. Downer Towing Corporation, 2 Cir., 1926, 11 F.2d 466; The Arpillao, 2 Cir., 1920, 270 F. 426.

DuPont will be allowed interest on its claim from August 3, 1953.

### Indispensable Party

In view of the nature of Banks' recovery and the finding of the court that Banks was the sole owner of the barge the libel is not lacking for failure to join an indispensable party. If, however, Banks deems it important to bring Mrs. Banks into the action the amendment will be granted. The D. J. Sawyer, 1 Cir., 1916, 236 F. 913.

There remains one further comment. Counsel for Banks have advised the court by letter dated March 14, 1958 that subsequent to the trial of the present cause Banks died. Accordingly, counsel are afforded permission to conform the original papers to reflect the present posture of the litigation.

### CONCLUSIONS OF LAW

In conformity with the court's specific findings and comments the following conclusions of law are set forth:

1. Respondent is solely at fault for the sinking of Banks' Barge No. 8 and the loss of cargo belonging to duPont.

2. Banks' libels are not barred by laches nor for failing to join an indispensable party.

3. Banks is awarded recovery for loss of the barge and acid carrying tanks in the sum of $27,667.

4. Banks is denied recovery for loss of barge and towing profits.

5. Interest will run on the Banks' award from November 13, 1956 at the rate of 6% per annum.

6. Costs are awarded Banks.

7. DuPont is awarded damages for lost cargo and salvage expenses in the sum of $7,492.95 with interest thereon from August 3, 1953, at 6% per annum.

8. DuPont is awarded costs.

Submit orders.