**KANSAS CITY BRIDGE COMPANY and Guy H. James Construction Company, a Joint Venture, Libelants,**

v.

**The M/V OLE MISS, Her Engines, Tackle, etc., and Valley Towing Company, Respondents.**

**No. G–C–24–60.**

United States District Court
N. D. Mississippi,
Greenville Division.

March 29, 1963.

Charles S. Tindall, Jr., Wynn, Hafter, Lake & Tindall, Greenville, Miss., for plaintiff.

Keady, Campbell & DeLong, Greenville, Miss., Lemle & Kelleher, New Orleans, La., for defendant.

CLAYTON, District Judge.

This action began with a libel filed by Kansas City Bridge Company and Guy H. James Construction Company, a joint venture, in rem against the Motor Vessel Ole Miss, her engines, tackle, etc. and in personam against Valley Towing Company claimed to be the owner of said vessel. Leave therefor having been obtained, Towing Service, Incorporated, as the owner, answered the libel and Valley Towing Company filed a cross-libel as bare boat charterer and owner pro hac vice of the barge M/V 77 against libelants. Property damage is claimed by libelants and by Valley Towing Company as a result of a collision between a tow and the Mississippi River bridge at Helena, Arkansas, which was then under construction by libelants. This collision occurred about 1:00 o'clock A.M. on the morning of March 6, 1960.

The case was tried to the court and submitted on briefs. The findings which follow are directed by the great weight of the evidence.

1) Construction of the bridge by libelants had progressed to the point where Piers 11, 12 and 13, numbered from the Arkansas side of the river, were from 20 to 25 feet above the water. The site of this bridge is at approximately Mile 658.1 above the Head of the Passes. About ½ to ¾ of a mile upstream and to the North of the bridge, there is an oil dock on the Arkansas bank called Dock No. 5. Above this dock the river runs in a generally Southwesterly direction for about 2.5 miles, but turns almost due South just above the dock and runs in that direction to the bridge site. From Mile 662 to Mile 660 the main channel is along the Mississippi bank, but, the channel moves toward the Arkansas bank between Mile 660 and Mile 659. From Mile 659 to the bridge site, the channel is against the Arkansas bank and the main channel passes between Piers 11 and 12.

2) Just prior to the collision, the Motor Vessel Ole Miss was proceeding downstream with a tow consisting of seven *empty* oil barges made up four barges wide on the lead string and three barges wide on the second string. The Ole Miss was made fast to the stern of the middle barge in the second string. The head of the tow was 200 feet in width and the total length of the tow and vessel was approximately 650 feet.

3) From the center of Pier 11 to the center of Pier 12 (between which the main channel passes) was 840 feet. The water distance from channel side of one pier to channel side of the other was 810 feet. From the center of Pier 12 to the center of Pier 13 was 756 feet with a clearance between the two piers of 725 feet. On the East side of each of these three piers there was anchored a barge which afforded a working platform for the construction workers. These were made fast by anchor cables attached to ship's anchors which were fixed approximately 500 feet above the barges on the bottom of the river. The anchor cables were submerged except for a short distance upstream from the barges.

4) On the deck of the barge anchored East of Pier 12 was a derrick or crane. This combination of equipment is called a "whirley barge".

5) Eugene L. Henderson was the pilot in charge of the Ole Miss and was heading downstream at approximately 12 to

13 miles per hour as he approached the Helena Oil Dock when he moved over toward the Mississippi bank to make room for a tow which was then pulling away from the dock heading upstream. At this time, he intended to run between Piers 12 and 13 and proceeded downstream from that point at 9 to 10 miles per hour, and without further slowing his speed he collided with Pier and Whirley Barge KCB 305 which was moored on the East side of that pier. The starboard side of the starboard lead barge in the tow of the Ole Miss (M/V 77) struck the pier about 30 feet from the bow. Two other barges in the lead string (V–880 and V–881) topped around and struck Pier 13 and Whirley Barge KCB 326 which was moored to the East of that pier.

6) The pilot of the Ole Miss was the only eye witness to the actual collision. Shortly after the collision, he signed a statement as follows:

"1:00 A.M. coming down river above Helena Bridge at reduced speed with 7 empty oil barges. Coming down between piers of bridge, looked like I was in perfect shape to proceed safely but all at once the tow began to swing to starboard and hit the derrick barge and the pier on the starboard side cause MV 77 to catch fire after hitting pier and this is the best knowledge of what happened.
"/s/ E. L. Henderson, Pilot"

He also signed a report of marine casualty (U. S. Coast Guard Form 2692) on March 6, 1960, in which was entered under Item 24, "Cause of Casualty", these words:

"Vessel flanked out of control and collided with bridge before I could stop."

He signed a similar report relating to Barge M/V 77 in which, under the same item, are these words:

"Motor vessel Ole Miss, towing T/b M/V 77, flanked out of control and collided with bridge pier before I could stop."

He testified in the Coast Guard hearing on March 6, 1960, as follows:

"Q. In your estimation what caused your tow to swing and hit the pier with the side of the barge?

"A. In slowing down, probably side wind which we did have, I would say about 10 miles per hour, gave me more slide than I realized I had.

\* \* \* \* \*

"Q. When you collided with Pier 12, did any part of your tow touch any part of the other pier?

"A. Yes, sir, barges V–880 and V–881 topped around on Pier 13."

■ 7) The pilot's testimony on trial was radically different from his previous versions about how the collision occurred. But, the position taken by him as aforementioned is compatible with and supported by all the other known facts and circumstances and especially with the physical damage resulting from the collision. It might be significant to note that the log of the M/V Ole Miss does not contain any recorded statement by the pilot. In these circumstances, little credit can be given to his version from the witness stand.

8) Pilot Henderson admits that he did not reduce his speed below 9 or 10 miles per hour until his tow was about 100 feet from Pier 12. He was familiar with the river and had traversed this area on many occasions. He knew there was wind and that his tow was in ballast, thus being more responsive to the wind and to the current. He was aware that the bridge piers were under construction and knew of the warnings printed in the weekly issues of the navigation bulletins put out by the Corps of Engineers, which called attention to the piers and the equipment working in their vicinity. He knew that libelants' equipment was moved from time to time, and that it could be expected to be in the vicinity of Piers 12 and 13. Only one of the two searchlights was working on the Ole

Miss, and there was no lookout. The one searchlight was never used on this approach to these piers and construction equipment. Henderson admitted on the stand that he saw the red warning lights, but claimed he could not see them at 2000 yards. Clearly he was inattentive.

9) Respondents admit negligence, but seek to cast fault on libelants in only two small particulars in order to obtain a division of the damages. Simply stated in summary, they say that the pilot did not see all the lights on the piers and whirley barges, which libelants say were in place, lighted and burning in the late evening of the day before. Libelants' evidence is also that these lights were of the type and were placed as required by Coast Guard Regulations applicable to this area. The overwhelming weight of the evidence also shows that the visibility of the type red lights used by libelants adequately met all statutory requirements and gave adequate warning. It is possible that the lights on libelants' barges were not quite as high above the water as technically required, but when compared with the gross negligence of the pilot, this would be a very minor fault. C. f. Coyle Lines v. United States (5 Cir. 1952) 195 F.2d 737; Socony-Vacuum Oil Co. v. Smith (5 Cir. 1950) 179 F.2d 672. This would be true even if such minor fault had any causal connection with the collision, which it does not. C. f. Compania De Maderas, etc. v. The Queenston Heights (5 Cir. 1955) 220 F.2d 120. Negative testimony that burning lights were not seen, when they should have been seen cannot help respondents. Dahlmer v. Bay State Dredging & Contracting Company (1 Cir. 1928) 26 F.2d 603.

10) This is another case where the moving vessel struck an immovable object. Thus the burden was upon respondents and their moving objects to exculpate themselves. State Road Department of Florida v. Gulf States Marine & Mining Co., 168 F.Supp. 242, aff'd 269 F.2d 83 (5 Cir. 1959); The Doris Dean (5 Cir. 1943) 135 F.2d 731. This they did not do and could not have done in the situation disclosed by the evidence before this court.

11) The sole cause of the collision and thus the sole responsibility for all libelants' damages must and does rest with the M/V Ole Miss and her owners.

The damages to the Kansas City Bridge Company and the Guy H. James Construction Company is hereby fixed in the amount of six thousand six hundred thirty-two dollars and eighty cents. ($6,-632.80).

Decree may be prepared for entry accordingly.