**SOUTHERN PACIFIC COMPANY,**
Libelant,

v.

**The UNITED STATES of America,**
Respondent.

No. 5702.

United States District Court
E. D. Louisiana,
New Orleans Division.

Feb. 17, 1966.

Chaffe, McCall, Phillips, Burke, Toler & Hopkins, James G. Burke, Jr., Robert B. Deane, for libelant.

Ernest N. Morial, Asst. U. S. Atty., Eastern Dist. of Louisiana, Allen Van Emmerik, Harold G. Wilson, Attys., Dept. of Justice, for respondent.

AINSWORTH, District Judge:

This libel was filed by Southern Pacific Company against the United States of America,[1] for damages sustained in the early morning of April 8, 1962, when the Berwick Bay railroad bridge, owned and operated by libelant, was struck by the United States Navy Tug USS BLACK FOX. The BLACK FOX was not damaged.

The Berwick Bay railroad bridge spans the lower reaches of the Atchafalaya River between Morgan City, Louisiana, on the east and Berwick, Louisiana, on the west. It consists of six fixed steel pen-connected truss spans, numbered from east to west 1 to 6, each 232 feet long and 14 feet wide, carrying a single track of the Southern Pacific Railroad. On the Berwick or west side of the bridge there is a steel turntable drawspan approximately 268 feet long, which pivots to a north-south direction and when open, provides a clearance of 109 feet on the west draw and 115 feet on the east draw. The drawspan, which is electrically operated by a bridge-tender, remains open for water-borne traffic except when accommodating crossing trains. On the superstructure of the drawspan there are red and green lights; when the span is open green lights face north and south. The construction of the bridge was originally authorized by the Secretary of War and the Chief of Engineers in 1907 and completed in 1908. Construction and subsequent modifications of the bridge and its appurtenances were at all times maintained and operated pursuant to statutory authority (33 U.S.C. 401; 33 U.S.C. 491).

The bridge fender system was located on the east side of the drawspan and extended to the north and south of the railroad bridge, each side projecting approximately 150 feet from the bridge. There was a red light at each end and in the center of the fenders. The purpose of the fender system was to protect vessels from colliding with the bridge while negotiating the east passage of the drawbridge. As a result of four separate collisions of other tugs with the fender occurring on December 20, 1961, December 28, 1961, January 1, 1962, and finally on January 19, 1962, the upstream fender protecting the east rest pier of the bridge was damaged and ultimately completely destroyed.

The BLACK FOX is a steel vessel approximately 100 to 110 feet long, with a 28-foot beam, and a displacement fully laden of 300 tons. It is powered by two diesel electric motors controlled from the wheelhouse. The wheelhouse is located approximately 10 feet above the main deck and 25 feet back from the bow and is semicircled by six windows.

On April 8, 1962, at approximately 5:23 a. m., the BLACK FOX, under the command of Chief Boatswain Mate Kenneth L. Young, left its berth at the U. S. Coast Guard Station located approximately 1800 feet upriver from the railroad bridge on the east bank. Chief Young was at the helm, Electrician's Mate First Class John DeShazo was also in the wheelhouse, Fireman Tigner was on duty in the engine room, and the remaining members of the crew were below in the galley. After pulling out from the dock the tug proceeded upriver for a sort distance, executed a port turn, and headed southward toward the open span of the bridge at approximately 10 knots; the current of the river was approximately 5 to 6 knots. In about five minutes after its turn downriver, the tug collided with the No. 6 fixed span of the bridge, adjacent to the drawspan.

[1.] Under the Public Vessels Act, 46 U.S.C. 781 et seq. and the Suits in Admiralty Act, 46 U.S.C. 741 et seq.

The bridgetender, Virgil E. Kreider, on duty at the time in the control house, testified that the speed of the tug appeared to remain constant from the time of its departure from the Coast Guard Station until the impact; that the course of the tug subsequent to its port turn until the time it collided with the bridge was forward and downriver. He said that at all times the tug was approximately 200 feet to the east of the east channel opening on its downriver course.

Chief Young's version of the incident differed from the bridgetender's. He said that daylight conditions were good and he could see all right. He also said that the tug, operating at a speed of 10 knots, was lined up to pass through the east passage of the drawbridge when it was approximately 500 feet away from the channel; at this time he reduced his speed to one third ahead; the tug was "shaped up good" and the bridge was open. After the reduction in speed, the swift current of the river caused the tug's stern to fall off to the right-hand side toward the west bank, placing the bow in a southeasterly position. Chief Young said he tried to straighten out the tug but he lost power. He advanced the throttle trying to get the engine started but it did not respond; he worked the throttle at various speeds but to no avail. He then ordered the electrician, DeShazo, to the engine room to investigate the loss of power; at about the same time he pulled the throttle to stop, jammed the tug in reverse, and the engine caught and started turning over. The tug was then about 200 feet from the bridge in an east-west position but still in a course toward the channel opening. The tug engines built up speed to full astern, and her headway when about 100 feet from the bridge was in a southeasterly direction. Young said he almost got the tug backed up and out of the way but the current was so strong he could not make it so he hit the bridge

with the bow of the tug at a point 75 to 90 feet from the channel opening.

Prior to the collision, bids had been solicited by the Southern Pacific from approximately twenty-two contractors for repairs and replacement of the bridge fender system necessitated by the damage caused by the four collisions in December 1961 and January 1962. Four contracts were awarded to C. S. Thorguson, of Berwick, Louisiana, the first on January 25, 1962 and the final contract on approximately February 19, 1962. Mr. Thorguson is an experienced contractor, well acquainted with the treacherous nature of the eddies and currents of the Atchafalaya River and aware of its high-water stages. Efforts were made by him to drive the necessary pilings to support the new fender system. However, because of the hazardous conditions of the river caused by the swift current and the 65-foot depth of the water at this location, the work of driving pilings 112 feet long was hampered and delayed. The first attempt by Thorguson which proved unsuccessful was made in the early part of January 1962. Two other attempts by him were also thwarted by unsatisfactory conditions. On one of these occasions the swift current caused an accident on Thorguson's floating rig and one of his helpers lost a finger; on another occasion his rig barely escaped capsizing in the river. It was necessary to suspend operations until the current subsided. The fender system was finally completed in June 1962, and now extends 157.5 feet from the north end of the west pier upriver with a slight inclination to the east.

Respondent's defense is that the collision was caused by libelant's failure to maintain and restore promptly the north protective bridge fender;[2] that such failure was a violation of a federal statute, 33 U.S.C. 491,[3] and a proximate cause of the collision; that such a statu-

2. Respondent apparently abandoned its defense of inevitable accident caused by power failure. Evidence was lacking as to the cause of the alleged recalcitrant throttle.

3. 33 U.S.C. 491 reads as follows: "When, after March 23, 1906, authority is granted by Congress to any persons to construct and maintain a bridge across or over any of the navigable waters of the

tory violation requires the application of the "Pennsylvania Rule," The Pennsylvania v. Troop, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148 (1874), which places the burden on libelant to prove the absence of the violation or that such violation did not or could not have contributed to the collision; that the Rule is applicable to structures such as bridges as well as vessels. See The Fort Fetterman v. South Carolina State Hwy. Dept., 4 Cir., 1958, 261 F.2d 563.

■ The "Pennsylvania Rule," as stated by the United States Supreme Court in The Pennsylvania v. Troop, supra, reads as follows:

"* * * when * * * a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been."

■ The error in respondent's argument is the premise upon which it is based, that libelant's improper maintenance of the fender system constituted a statutory violation.[4] We find that there was no improper maintenance of the system and therefore no statutory violation requiring the application of the "Pennsylvania Rule." The weight of the evidence also shows that the BLACK FOX did not traverse the area of the missing fender; therefore, its presence could not have deflected the tug to a safer course.

■ We find no negligence or lack of due diligence on the part of libelant to maintain, operate and repair its bridge

---

United States, such bridge shall not be built or commenced until the plans and specifications for its construction, together with such drawings of the proposed construction and such map of the proposed location as may be required for a full understanding of the subject, have been submitted to the Secretary of the Army and Chief of Engineers for their approval, nor until they shall have approved such plans and specifications and the location of such bridge and accessory works; and when the plans for any bridge to be constructed under the provisions of sections 491–498 of this title, have been approved by the Chief of Engineers and by the Secretary of the Army it shall not be lawful to deviate from such plans, either before or after completion of the structure, unless the modification of such plans has previously been submitted to and received the approval of the Chief of Engineers and of the Secretary of the Army. Mar. 23, 1906, c. 1130, § 1, 34 Stat. 84."

4. Cases cited by respondent are distinguishable. In The Fort Fetterman v. South Carolina State Hwy. Dept., 4 Cir., 1958, 261 F.2d 563, the Pennsylvania Rule was applied, but the court found the bridge construction "not in accordance with the plans attached to and made a part of the permit issued * * * by the War Department. There were, for rea-

sons not disclosed by the evidence, material variances between the approved plans and actual construction," and the substantial deviations constituted a violation of the statute. In E. I. Du Pont De Nemours & Co. v. Pennsylvania R. Co., D.Delaware, 1958, 167 F.Supp. 80, which involved damage to a barge, the Christina River was closed to navigation for a month by the U. S. Army Engineers to permit the railroad to repair its bridge and fender system. The railroad did not commence work until one day before navigation was to be resumed; permission for constructing the specific repairs had not been approved by the Corps of Engineers, nor was any notice or warning of the condition given to navigation. In M. P. Howlett, Inc. v. The Catherine Carroll, E.D.N.Y., 1944, 56 F.Supp. 466, the offending railroad had neither repaired nor attempted to repair its bridge and fender system, and no notice of the condition of the structure which constituted a "menace to navigation" had been given by the railroad. In J. F. Schoellkopf, Jr.—Canal St. Bridge, N.D.Ind., 1960, 1961 A.M.C. 391, negligence on the part of the bridge owner was based on a material deviation from the War Department Permits under which the bridge appurtenances and pile clusters were maintained. Pile clusters had deteriorated, broken and rotted. There was no evidence to show attempts to repair the structure.

and fender system. This structure and its appurtenances were built, modified and maintained in conformity with plans and specifications authorized and approved by the United States Government. The destruction of the north fender system was caused by it being struck by four different tugs within a period of one month, which circumstances were entirely beyond the control or responsibility of libelant. Every reasonable effort was made to restore the fender immediately; the contract for its repair was awarded six days after the initial damage; the final contract for the fender's replacement was awarded approximately one month after its demolition. We do not find this an unusual delay, considering the magnitude of the project and the two interim collisions. Despite libelant's diligent efforts, the repairs were not completed until five months subsequent to awarding the contract. However, this delay cannot be attributed to libelant or to the lack of diligence on the part of the contractor, Thorguson, whose work was seriously impeded by unfavorable conditions in the river. Libelant immediately notified the Coast Guard and the Corps of Engineers of the damage and subsequent destruction of the north fender in order to warn mariners navigating in the area to proceed with extreme caution because of the hazardous conditions existing. Notices and bulletins were disseminated by these agencies to inform navigators of the danger.[5]

Captain Young testified that he did not remember having seen any of these notices and did not know that they were available at the Government's locks and bridges. His lack of knowledge or failure to avail himself of this information cannot be attributed to lack of due diligence by libelant.

■■ The presumption of negligence on the part of a moving vessel which collides with a stationary structure is well established in maritime law. The Oregon, 158 U.S. 186, 15 S.Ct. 804, 39 L.Ed. 943 (1895); Wetmore v. The Steamboat Granite State, 3 Wall. 310, 70 U.S. 310, 18 L.Ed. 179 (1866); Kansas City Bridge Company v. M/V Ole Miss, N.D. Miss., 1963, 215 F.Supp. 658; Sewerage & Water Board of New Orleans v. The Joe L. Hill, E.D.La., 1954, 118 F.Supp. 951; Bisso v. Inland Waterways Corp., E.D.La.1953, 114 F.Supp. 713. Respondent has not only failed to overcome this presumption but has failed to show negligence of libelant which could have contributed to the accident.

■ In our view the sole cause of the collision was the negligence of the master and crew in failing to use the extreme caution required in attempting to navigate through a dangerous channel when they knew or should have known of the missing fender and of the swift, powerful and treacherous currents and eddies prevalent in the Atchafalaya River, particularly at its high-water stage.[6] The

5. The U. S. Army Engineers issued various navigation bulletins. Mariners were warned on January 3, 1962 that "The fender which protects the north end of the east rest pier of the Southern Pacific Bridge across Atchafalaya River at Berwick, Louisiana, Mile 17.5, above the mouth of the waterway, has been damaged as the result of a navigation accident. The rest pier has very little protection and is subject to damage by passing vessels. Mariners are directed to exercise caution when passing through the navigation opening of the bridge." A similar bulletin of January 22, 1962 advised that the fender system which protects the east rest pier of the bridge was completely destroyed. Mariners were warned to approach the bridge with caution and make

every effort to steer clear of the east rest pier. Again on March 23, 1962 mariners were cautioned to weigh all factors in navigating, such as wind conditions, current velocity, time required to open the railroad bridge, and the power sufficiency of the vessel. On March 27, 1962 mariners were cautioned as to high velocity currents in the main channel, eddies and cross-currents at channel intersections and bridges; rapid shoaling at critical areas; reduced vertical clearances at bridges. Similar notices were circulated by the U. S. Coast Guard.

6. Captain Young testified that on the day prior to the collision, the tug passed through the drawspan on its upriver voyage and that he observed the fender sys-

Navigation Bulletin of the Corps of Engineers of March 23, 1962 warned mariners "that the velocity of flow through the reach of the Lower Atchafalaya River (Berwick Bay) in the vicinity of the Southern Pacific Railroad Bridge at Morgan City, Louisiana, has reached the critical point for underpowered tows navigating in the area."

Proctors for ·libelant will prepare an interlocutory decree accordingly.

tem of the bridge. An entry in the Quartermaster's Notebook of the BLACK FOX signed by Captain Young on April 8, 1962, shows, "Conditions of River at Morgan City, La. was Very Swift, Current of River 5 or 6 Knots."