STATE ROAD DEPARTMENT OF FLORIDA, Plaintiff,

v.

GULF STATES MARINE & MINING COMPANY, a corporation, Defendant.

Civ. A. No. 398.

United States District Court
N. D. Florida,
Marianna Division.

Dec. 18, 1958.

Richard B. Austin, Jacksonville, Fla. for plaintiff.

Richard P. Warfield, Fisher & Hepner, Pensacola, Fla., Thomas B. Wheeler, New Orleans, La., for defendant.

CARSWELL, Chief Judge.

This cause is submitted to the Court without jury on depositions and stipulations. The action arises out of collision of defendant's tug with the Hathaway Bridge, owned by plaintiff, at Panama City, Florida, shortly after noon April 4, 1952. The evidence discloses that the tug was pulling with a "Y" yoke three empty steel barges in close line. The steel barges were each approximately 185 feet long and 35 feet wide. The tug's operator had clear vision of the bridge when he was approximately three-quarters of a mile south of it as the tug advanced northward. The Hathaway Bridge ran generally east and west with a swing span creating two north-south channels for navigation.

At 12:00 o'clock noon the Captain of the tug had just come off watch and was in the galley as the tug made its turn around Dyer's Point to approach the bridge. The Mate was at the helm from this time and throughout the time leading up to the collision and separation of the tug. The evidence is clear that the Captain was thoroughly familiar with the navigation of this channel and knew that the passage through the bridge was difficult because of the angle and velocity of the wind and tidal currents (Roberts' Deposition Page 28). This was the first time that the Mate had actually attempted to navigate a tug and tow through this bridge.

As the tug rounded the Point, the first signal to open the bridge was blown. As the tug approached and the bridge did not open, a second signal was blown by the tug. Although the testimony of the Captain and the Mate is somewhat in confusion as to the precise time, the Captain went from the galley to the bridge shortly before or after the second signal was blown. In making its northward approach to the bridge, the force of the wind struck the starboard side of the tug, causing it to drift out of line to the port side, or towards the west side of the bay.

Plaintiff's bridgetender normally stayed in a bridge house above a portion of the traveled highway in the middle of the swing span. This house contained the machinery for operating warning signals, traffic gates and opening the swing span. His view was not obscured by any artificial obstruction. There was also a private radio in the bridge house. The evidence shows that this bridgetender was 64 or 65 years old and partially deaf in one ear; that he knew the rules as to the signals to and from the vessels and was able to operate the mechanism to land traffic and opening the swing span.

As the tug attempted to navigate the east channel, collision occurred with the tow and the piling (east and west fender system of plaintiff's bridge).

It is the contention of defendant that the bridgetender did not open the span promptly and that he further failed to give appropriate warning signals of his inability to do so; that when the operator of the tug recognized the possible danger of collision due to his normal speed and prevailing wind and current conditions, he could not turn port or starboard without certain whiplash effect upon his tow; that his only course of action was to sharply reduce speed, hoping the span would open in time. The tug itself did clear the span, but the tow of barges buckled out of line due to lost momentum in the wind and current action and the lead barge collided with the bridge.

Upon the evidence, the Court cannot find negligence in behalf of the bridgetender. There is nothing in this record making any affirmative showing on the point. It is argued that the bridgetender might have been momentarily inattentive to his duties since he had a private radio in the bridge house, or that he might have been distracted by some activity on the bridge. His partial deafness in one ear and his age is also

noted. It is clear, however, that the bridgetender did in fact hear the tug's signal and proceeded to open the bridge, if not instantly then rather soon. The defendant has failed to carry the burden of proof as to the contributory negligence of plaintiff in this regard. Even if this were not so, however, in State Road Department of Florida v. United States, D.C.N.D.Fla.1949, 85 F.Supp. 489, 500 affirmed 5 Cir., 189 F.2d 591 certiorari denied 342 U.S. 903, 72 S.Ct. 291, 96 L.Ed. 676, it was held:

"The fact that one hits and damages an immovable object with a movable one demands that the operator of the movable object be required to exculpate himself. The bridge did not hit the ships and the doctrine of res ipsa loquitur is applicable in this case and will serve to supply an inference of the lack of due care in the absence of explanation by defendant."

 The defendant here has not exculpated itself upon the evidence. The duty imposed upon a vessel approaching a bridge requires that:

"A vessel must approach a bridge with reasonable skill and care to avoid injuring it, having in view the difficulties and perils including those caused by the bridge itself." 80 C.J.S. Shipping § 77 d, p. 805; see also The Marguerite W., D.C. E.D.Wis.1943, 49 F.Supp. 929, affirmed 7 Cir., 140 F.2d 491."

This testimony shows that the vessel failed to achieve this standard of operation in navigating the draw of the Hathaway Bridge. It is sufficient to recall that the Captain was fully aware of the hazardous conditions of this particular passage, that he permitted his Mate, who had not attempted to navigate this passage, to operate the tug and tow, totaling 555 feet in length, with unfavorable wind and current conditions at the time. It is plain that the tug approached the bridge draw too rapidly and without proper care for its own safety or that of the span, having recognized the hazard too late to prevent certain collision. While it may well be true that the defendant took the best course of action at this moment in proceeding through the draw rather than attempting to turn, the peril was the result of its own unwarranted assumption that the bridge would open in time for it to pass with enough speed necessary to keep the long tow in line.

It is stipulated that the actual cost of repairs of the bridge was $10,545.25, not including engineering services which are not allowable; that the salvaged piling was worth $765; that the net total damages of plaintiff amount to $9,780.25. Judgment will be entered for plaintiff accordingly.