GREENVILLE GRAVEL COMPANY and Witco Company, the DREDGE LEE McCOURT, BARGES 201 AND 203, Engines, Tackle, etc., Libelants,

v.

ILLINOIS FARM SUPPLY and the MOTOR VESSEL ILLINI, Her Engines, Tackle, etc., Respondents.

No. G-C-30-61.

United States District Court
N. D. Mississippi,
Greenville Division.

March 28, 1963.

Douglas C. Wynn, Wynn, Hafter, Lake & Tindall, Greenville, Miss., for plaintiff.

James E. Ross, Houston, Tex., for defendant.

CLAYTON, District Judge.

This action began with a libel filed by the Greenville Gravel Company, the Witco Company and the dredge Lee McCourt, Barages 201 and 203 against the Illinois Farm Supply Company and the M/V Illini, who subsequently filed a cross-libel. Property damage is claimed by all parties for a collision between these two vessels which occurred at 3:00 o'clock A. M. on March 8, 1961, at about Mile 559.0 of the Mississippi River.

The case was tried to the court and submitted on briefs. The findings which follow are directed by the great weight of the evidence.

1) On March 8, 1961, at 3:00 o'clock A. M., the dredge Lee McCourt, owned by the Greenville Gravel Company, was anchored over Eutaw Bar at or about Mile 559.0 of the Mississippi River. The dredge was anchored approximately 1000 feet from the Arkansas shore and the river was approximately 3000 feet wide at this point on March 8, 1961, and was

anchored one-half mile below Chicot City Point, a promontory on the Arkansas side of the river. The channel of the river runs off this point on the Arkansas side to the Mississippi side at about Mile 559.3 and thence the channel follows the Mississippi shore to about Mile 557.7.

2) The dredge Lee McCourt was not anchored in the navigable main channel of the Mississippi at the time of the collision.

3) The dredge Lee McCourt is a non-self-propelled sand and gravel dredge 160 feet long and 50 feet wide. On the night in question, the dredge was anchored headed upstream and was held in place by two anchors each attached to a 1000 foot cable leading from winches in anchor rooms on either side of the bow of the dredge out over Anchor Barge No. 3–A, a steel barge 65 feet by 30 feet by 8 feet, through fair-leads on the bow corners of the Anchor Barge No. 3–A. The dredge was practically all the way out on its cables. There were no buoys on the anchors. Tied to the starboard side of the dredge were three barges: the PL–105, a steel barge of riveted construction, 150 feet by 35 feet by 11 feet, was tied next to the dredge; next to it, on the starboard side of the PL–105 were tied in undetermined order the identical steel barges, 201 and 203, each 135 feet by 32 feet by 8 feet. These three barges were tied abreast of each other and approximately 15 feet back from the bow of the dredge itself. Tied to the starboard stern of the dredge was a work flat and to the work flat the crew boat Mary Frances was attached.

4) The dredge had the following lights burning: Two red lights properly spaced and located on her forward mast; one white light at each corner of the overhang of the deckhouse, and in addition approximately 50 other lights burning, which were spaced beneath the overhang of the deckhouse roof.

5) The barges had these lights burning: Dietz No. 8 kerosene lanterns or similar lanterns with ordinary wicks and plain glass lens placed on the port bow of Anchor Barge 3–A and on the starboard bow and stern corners of the outermost barge tied to the starboard side of the dredge. These lanterns were placed on the deck, but because of the freeboard of the barges these lights were elevated to a height of 6½ or 7 feet above the water line.

6) The proof shows that the lights on the dredge and barge were visible at a distance of at least two miles on the night of March 8, 1961.

7) The M/V Illini, owned by Illinois Farm Supply Company, is a steel towboat, 117 feet long, powered by three engines and having four rudders and three propellers. She was coming down river with three empty oil barges, the IFS 301, 302, and 303, each 250 feet long by 50 feet wide. The Illini was made up to one barge and it in turn was made up to the two barges which were tied abreast of each other. The distance from the bow of the Illini to the head of the tow was 520 feet and her pilot house was some distance back from the bow.

8) The M/V Illini was being piloted by Captain James W. Coats who holds licenses both as pilot and engineer in these waters and has had many years experience on the Mississippi River. Captain Coats in the pilothouse was at the controls of both the engines and the rudders. The pilothouse was constructed largely of glass so as to give him clear visibility of all points forward of his beam.

9) Earlier in the evening Captain Coats had passed the M/V United States which was upbound pushing a wide tow. The pilot of the M/V United States had advised Captain Coats by radio that his tow consisted of 36 barges, that he had passed between the dredge Lee McCourt and the Arkansas bank and that he had encountered a minimum depth of water of 20 feet West of the dredge.

10) Captain Coats had passed the dredge Lee McCourt at other times and knew its usual appearance and that it was customarily anchored below Chicot City Point. He first caught sight of the

lights of the dredge as he rounded Catfish Bend, which is about 4 miles from where the dredge was anchored. As the Illini descended through the bend, Captain Coats lost sight of the dredge behind Chicot City Point, but prior to reaching this position Captain Coats had decided to pass the dredge on the Arkansas side to save approximately two miles in distance.

11) As the Illini rounded Chicot City Point, the lights of the dredge again came into view, and Coats started making his contemplated right turn. At this time, the towboat swung out in the current coming off the point while the lead barges in the tow were in slack water under the point. The action of the current, coupled with the westerly wind, caused the Illini and tow to commence a "slide". The boat and tow did not move straight ahead but moved at an increasing angle down river. The Illini and its tow went out of control after it started to slide.

12) After the Illini got into its turn, the pump operator on the dredge, Langley, who was at the water fountain on the port side of the engine room, saw the Illini's search light fixed on the Arkansas shore. He immediately ran to John Adams, the master of the dredge, to inform him. Adams ran to the bow of the dredge on the port catwalk. As he approached the bow of the dredge, he could see the Illini and tow at approximately a 45 degree angle to the dredge with the lead barge closer to the dredge than the boat, coming fast. When he reached the bow of the dredge, the Illini and its tow were about 500 to 600 feet away. He realized a collision was imminent but blew two blasts on the dredge whistle and then immediately ran through the dredge, warning the crew to abandon the ship. When he blew the signal, he was acting under conditions "in extremis".

13) When the Illini was about 500 feet from and "setting down" on the dredge, or at about the same time Adams blew the two blast signal, Coats blew a one-blast signal and immediately thereafter blew a four-blast signal.

14) Even when Coats realized his tow and boat were "setting down" on the dredge, and when he saw the whistle light indicating a signal, he did not stop engines or try to reverse, but moved ahead at the same speed of 14 to 15 miles per hour. He finally attempted to take one of his engines out of full ahead about the instant before the impact.

15) The lead barge of the Illini hit the Anchor Barge No. 3–A. The main impact was approximately 150 feet forward of the port stern of the port lead barge in the Illini's tow. The Illini and its tow were at approximately a 90 degree angle to the dredge at the moment of impact. The port lead barge in the Illini's tow broke away and went past the dredge on the port side. The Illini and the remaining barges topped around and passed the dredge to starboard. The port side of the Illini struck the outside gravel barge lying alongside the dredge.

16) The dredge was anchored so as to leave more than ample room East of her for downbound vessels to pass in safety. The dredge was neither a hazard nor an obstruction to navigation.

17) Captain Coats, prior to attempting to run between the dredge and the Arkansas bank, knew, or should have known, the wind and current conditions then existing, that his tow would likely go into a slide when he made the right turn, that the wind and swift current would make the tow slide even worse, that the dredge Lee McCourt was close to the point and the Arkansas bank leaving him little room to recover from a slide and that at a speed of 14 to 15 miles per hour the Illini and tow would reach the dredge in approximately two minutes. Knowing this he failed to negotiate the point keeping reference to his position and the bank although the visibility was good. Coats did not realize that the Illini was out of control until he was some 500 to 600 feet from the dredge. Even then he did not reduce his speed or try

to stop and back up, but continued ahead into the collision. This was negligent navigation.

18) The lights on the dredge Lee McCourt were in compliance with the regulations of the United States Corps of Engineers for dredges. While the lights on the barges attached to the dredge may not have been strictly in compliance with these rules, since they were placed on the deck and not 6 feet above it, they were placed in accordance with custom on the Mississippi River and were of the proper intensity. The lanterns were of sufficient visibility and sufficient height from the surface of the water to give ample notice to all downbound traffic of the location of the barges and any technical noncompliance with the rules had no causal connection with the collision.

19) The aforementioned faults of the M/V Illini were the sole cause of the collision.

Respondents, upon the trial of this case and in the brief to the court make numerous attempts to cast some fault for this collision upon the dredge Lee McCourt and its flotilla. These contentions can be disposed of summarily in the light of the court's findings enumerated above.

█ There is no duty to sound a danger signal when peril is discovered so late so as to render a signal useless. Arthur-Smith Corp. v. Gulf States Marine & Mining Co. (5 Cir., 1958); 258 F. 2d 449. Griffin Collisions (1949) § 80.

█ Since the dredge was not anchored in the navigable main channel, lighted or marked anchor buoys were not required. Coast Guard Regulations 33 CFR § 95.51.

█ The dredge was safely and properly lighted. Technical failure, if any, of the lighting or any of the other purely technical failures of the dredge or its crew was not a contributing cause of the collision. Even though the facts might show that some fault, by some tenuous reasoning could be fixed on the dredge, this is entitled to be excused under the major-minor fault rule. Cf.

Coyle Lines v. U. S. (5 Cir., 1957), 195 F.2d 737. Socony-Vacuum Oil Company v. Smith (5 Cir., 1950), 179 F.2d 672. The crew of the Lee McCourt cannot be charged with the duty to navigate the Illini safely. Cf. State Road Department of Florida v. Gulf States Marine & Mining Co., 168 F.Supp. 242, aff'd 269 F.2d 83 (5 Cir., 1959).

Since the collision was the sole fault of the M/V Illini, the only question left for determination is the amount of libelants' damages, which are hereafter fixed.

a) The Witco Company: damages in the amount of $25,000.00 for the loss of their barge the PL-105.

b) The Greenville Gravel Company: damages in the total amount of $21,188.-50, which damages may be broken down as follows:

| | | |
|---|---|---|
| (1) Loss of the Anchor Barge 3–A | | $8,000.00 |
| (2) Cost of replacement of other appurtenances | | $7,842.75 |
| (3) Labor and services and loss of use | | $5,345.75 |

Decree may be prepared for entry.