**CANAL BARGE COMPANY, Inc.**

v.

**S/S NANCY LYKES, her engines, etc., M/V WILLIAM S. SMITH, her engines, etc., Lykes Bros. Steamship Co., Inc. and Crescent Towing & Salvage Co., Inc.**

**No. AD 8163.**

United States District Court
E. D. Louisiana,
New Orleans Division.
April 5, 1968.

Robert B. Acomb, Jr., Robert Contois, Jr., New Orleans, La., for plaintiff.

Alfred M. Farrell, Jr., New Orleans, La., for Lykes Bros.

Thomas W. Thorne, Jr., New Orleans, La., for Crescent Towing.

CASSIBRY, District Judge:

Plaintiff, Canal Barge Company, Inc., brought this action to recover damages sustained by its barge CBC-38 which, when in tow of the MV JOSEPH M. JONES, of the same ownership, was in collision with the SS NANCY LYKES, owned and operated by defendant Lykes Bros. Steamship Co., Inc. A cross-claim for the NANCY LYKES' greater damages was filed. The plaintiff joined as a co-defendant Crescent Towing & Salvage Co., Inc., owner and operator of the tug WILLIAM S. SMITH which at the time was assisting the NANCY LYKES.

After considering the evidence and applicable law, I find that the defendant NANCY LYKES was solely at fault and will enter judgment accordingly.

The MV JOSEPH M. JONES was constructed in 1963 and is 144 feet in length, 40 feet in beam, 9 feet in depth and of a burden of 594 gross and 403 net tons. It is a Mississippi River pushboat, with pilot house controls to the engine, equipped with steering and flanking rudders, and propelled by diesel motors of a combined horsepower of 4300 to twin screws.

The SS NANCY LYKES, constructed in 1961, 495 feet in length, 67 feet in beam, is an ocean-going cargo liner, propelled by a steam turbine engine to a single screw. At the time of the accident she was loaded with some 6000 tons of general cargo to a draft of 24 feet 4 inches forward and 28 feet 2 inches aft.

The assisting tug WILLIAM S. SMITH is 144 feet in length, 32.7 feet in beam, 15.7 feet in depth and propelled by a steam engine to a single screw rated at 1850 horsepower.

On the afternoon of June 14, 1965, the NANCY LYKES, moored bow upriver, starboard side to her berth at Nashville Avenue wharf in New Orleans, was preparing to depart and shift downriver to the Army Base at the Poland Street wharf to complete the loading of her cargo for a foreign voyage.

The towboat JOSEPH M. JONES was bound upriver from Port Sulphur, Louisiana, to Joliet, Illinois, pushing a tow of six loaded Molten Sulphur barges ahead. The barges were arranged two abreast in three tiers and made rigid with ratchets and cables. The beam of the tow was 104 feet and the overall length of the flotilla, including the towboat, was 945 feet. Against an estimated current of 3 to 4 m. p. h., the JONES tow made good about 11 m. p. h. After getting in the harbor below Algiers Point, her twelve noon to 6:00 P.M. watchstander, the pilot, reduced from 750 revolutions to 350 revolutions giving a speed estimated at 5 m. p. h. over the ground.

At Nashville Avenue wharf at 1650 hours the tug WILLIAM S. SMITH made up at the port bow of the NANCY

LYKES. The assisting tug's function was to carry out the state pilot's orders from the bridge of the NANCY LYKES, received via walkie-talkie, and assist in the unberthing and turn-around maneuver. The pilot and his apprentice were on the bridge with the ship's master. The third officer was at the telegraph and quartermaster at the wheel. The chief officer, boatswain and several crew members were at the bow. Both boilers were on the line and the engine room had a full head of steam.

The maneuver to turn completely around and head downriver was normally done in one of two ways. One was to move away from the dock, make a left-hand turn, and let the current catch the bow and turn downstream. The other method, which those in charge of the NANCY LYKES decided to use, was to head upriver and diagonally across to the Westwego (west) bank on easy port rudder, and while on the west side, to pivot about to starboard in a gradual right turn, with the tug WILLIAM SMITH nosing onto the port bow while the vessel, using astern engines, would bring her bow to starboard while falling down with the current. At the time the visibility was clear and unrestricted, save for the contour of the New Orleans wharves downriver from Nashville Avenue. The navigable width of the river across to where the bank slopes in shallow water at Westwego is about 1,750 feet. The lines were cast off at 1659 and the NANCY LYKES headed diagonally on about a forty-five degree angle across the river on a slow ahead, and then a half-ahead bell.

During this time the NANCY LYKES was being conned by an apprentice State Pilot, under the supervision of a licensed state pilot and the master of the NANCY LYKES.

The JONES tow was upbound in the river paralleling the east bank and several hundred feet off the New Orleans wharves. Her pilot, alone on watch, had observed the NANCY LYKES with the tug WILLIAM SMITH alongside when they departed Nashville Avenue wharf

and at that time the JONES and its tow were about a mile and a half downriver. At first he assumed that the NANCY LYKES, crossing center river into the west side, would turn about to her port and head downriver. When she continued across river near the Westwego side, he assumed she was destined upriver and not intending to turn downriver. The pilot of the JONES sounded a one-blast whistle signal which signified that he proposed to pass the NANCY LYKES on the port side of the JONES tow.

The NANCY LYKES, at the time, appeared to be steaming parallel to the west bank straight upriver. On the NANCY LYKES, mud bubbles off the stern indicated the proximity of shallow water, and the master feared that the stern was too close to the bank. It was during this time that the JONES was heard to sound the one-blast whistle signal. The NANCY LYKES' pilot and master went out to the starboard wing and saw the flotilla less than a mile downriver off the lower end of the Grain Elevator favoring the New Orleans side. The pilot promptly ordered the apprentice to reply with one-blast whistle and it was heard by the JONES.

In view of the positions of the vessels and their movements in the river, when there was an agreement reached by those in charge of the navigation through the exchange of whistle signals, the Overtaking Rule applied. The JONES tow maintained her course and speed and directed her course to pass the NANCY LYKES in the manner provided by the Inland Rules, but as the distance separating the vessels narrowed the NANCY LYKES suddenly turned to her starboard and travelled across the middle of the river, colliding with one of the barges in the JONES tow.

Just before impact, the pilot of the JONES had reversed his twin rudders from hard-to-starboard to hard-to-port in an attempt to lift the stern of the towboat to the right. The point of collision on the Barge CBC-38, the third in line in the port tier was about 60

feet forward of the JONES bow. The port side of the barge was indented a distance of about 30 feet with an increasing penetration to a maximum of 4 feet. The NANCY LYKES sustained damage at her stem and in the adjacent plates on either side. The angle of impact was approximately sixty degrees between the fore and aft line of the NANCY LYKES and the port side of the barge.

The defendants' version of the events just preceding the accident is that after reaching the west bank, the licensed pilot relieved the apprentice because he (the licensed pilot) and the master of the ship were concerned about the propeller and rudder of the ship becoming damaged in the mud of the west bank. The defendant claims the NANCY LYKES was not on a fixed course but was maneuvering, and for that reason the Special Circumstances Rule and not the Overtaking Rule was applicable.

The defendant contends that the Overtaking Rule cannot apply because the courts have held that for this rule to apply the two vessels must be steering known, discernible courses and proceeding in the same direction and the overtaken vessel must be on a fixed course. The defendants claim the NANCY LYKES was maneuvering to turn right and go downriver, that when it answered the one blast, it merely signified that it was continuing its maneuver and that the JONES should stay clear. Instead of heeding that admonition, defendant contends that the JONES continued ahead at full speed and while attempting to shape for Greenville Bend (a turn in the river), made a pronounced turn to her own right which caused her stern to flank laterally to her left into the bow of the NANCY LYKES.

In support of their version of the accident, the defendants rely rather heavily upon the engine bell and deck bell book times and entries. They do, in some respects, support the defendants' position. The bell books show that at 1713 the engines were stopped. Defendants contend that while the engines were stopped, the stern began moving too close to the west bank. At the 1713 bell, the licensed pilot took the con from the apprentice. At 1714½ the bell books indicated that the engines were again stopped, then put half astern at 1715 and full astern at 1715½ or 1716. Then at 1716½, when a collision was imminent, the pilot ordered a "Jingle" (emergency) full astern. According to the bell book the collision occurred at 1716¾. Defendants produced evidence that at the time of the collision, the NANCY LYKES was either at a standstill or had gathered sternway through the water.

The bell book shows that the NANCY LYKES continued backing until 1718 when the stop signal was given. At 1719¾, helf astern was ordered; at 1721, a stop order was given followed by slow astern at 1723 and half astern at 1724 and stop at 1725. Defendants insist that the NANCY LYKES was only 150 to 200 feet off the Westwego shore when the collision occurred at 1716¾. The defendants argued from these facts that, since the ship's engines were running ahead for such a short period of time before the collision, it could not have been far from the west bank when the accident occurred and certainly could not have been across the middle of the river as contended by the plaintiff.

There was undoubtedly some confusion on the bridge of the NANCY LYKES beginning at a time when it reached the west bank. Its stern did come too near to the west bank causing the master such concern that he insisted that the regular pilot relieve the apprentice shortly after arriving there. A logical reading of the bell book times and entries would be that the NANCY LYKES reached the west bank at 1706 and at that time began its maneuvers to turn right. The LYKES was apparently parallel to the bank at 1706 and the engines were slow ahead and continued at slow ahead for 4 minutes. It was then slow astern and half astern 2½ minutes, then dead slow ahead for ½ min-

ute, and half ahead for 1½ to 2 minutes. During these maneuvers, it had certainly moved away from the bank further than the 150 to 200 feet estimated by defendants' witnesses. Even if her engines were not going ahead any appreciable time, the WILLIAM SMITH (a large and powerful towboat) was pushing her bow hard to starboard and with the favoring current it moved a good distance offshore. This movement offshore started after the exchange of signals because at that time the NANCY LYKES was parallel to the bank and apparently heading upstream. Any vessel downriver and particularly the JONES would have thought she was on a fixed course because it used the overtaking signal. The ship's reply, whether they intended it or not, was an acknowledgment that this was indeed an overtaking situation. There is no other explanation for the NANCY LYKES' answering blasts. The Inland Rules of the Road which this Court holds to be applicable to this situation clearly provide that under the circumstances of this case, in view of the positions of the vessels, this was an overtaking situation and if the Lykes' vessel did not think it was safe for the JONES tow to overtake and pass her, then she was required to sound a danger signal and not a one-whistle signal assenting to the overtaking. 33 U.S.C. § 203.

All the parties agree that the NANCY LYKES was approximately perpendicular to the west bank when the collision occurred. There is some evidence that its bow was heading slightly downstream.

Captain Stanton McNeely, the master of the WILLIAM S. SMITH, testified that he was pushing into the bow of the NANCY LYKES at full speed ahead just prior to the accident. His was a powerful tug and its movement was undoubtedly pushing the ship further out into the river. Captain McNeely's testimony at this point is as follows:

"Q: And, you were pushing at full speed ahead?

A: Full speed ahead.

Q: Then, what happened, when did you see the barge for the first time?

A: Oh, I seen the barge just about the time he hollered slow, you know, and stop. I looked out the window and I said, Christ, look at them barges right in front of me, because, you can't see over that ship on to the other side. I seen the two coming by, I seen the first two barges clear the ship off the bow. He told me to go back and I tripped around with the motion of the ship and I thought then that I was going to trip but I backed anyway, to avert the collision."

Captain McNeely testified further:

"Q: Do you remember where the bow of the—at the time of impact, whatever it was, whether it was a brushing or a collision or not, where was the bow of the LYKES with relation to the sides of the river? Was it in the middle of the river, was it on the east side or closer to the west bank?

A: No, I'd say the Lykes Brothers ship, I'd say it was between 500 and 700 feet off the bank of Henry Clay, the Henry Clay side.

Q: The Henry Clay side being the east side?

A: That's right, the east bank. Henry Clay is right under Six Mile Point.

Q: At the time of impact, then, the Lykes ship's bow, the bow was about 500 to 600 feet off Henry Clay?

A: Yes sir. You know it was getting dark."

This testimony indicates that Captain McNeely's tug was ordered to continue pushing the NANCY LYKES away from the west bank at full speed until moments before the collision. His statement of the position in the river of the NANCY LYKES at the time of impact is also more likely the true position of the ship than the 150 or 200 feet off the west bank as testified to by defendant's witnesses. Plaintiff's witnesses state categorically that the JONES maintained her position on the east side of the river at all times, but those statements too

are not entirely supported by the evidence.

In making its slight turn to the right to negotiate the turn in the river at that point, the JONES undoubtedly canted somewhat to the left away from the east bank, probably a little more than the JONES' master anticipated but the evidence is clear that it was not enough to cross the imaginary center of the river. On the other hand, the NANCY LYKES did cross that line by at least two or three hundred feet and in so doing was solely at fault for the ensuing collision. I find no fault with the course of action taken by the master of the JONES. When he observed the NANCY LYKES parallel to the west bank, and it appeared to be holding its course, he properly used the overtaking signal as provided by the Inland Rules of the Road.

The Pilot Rules for Inland Waters are clear and unequivocal. If the NANCY LYKES did not wish the Canal Barge tow to pass or to approach her when she heard the one whistle signal blown by the Canal Barge tow, all that was necessary for her to do was to blow on her whistle four blasts which would require the Canal Barge tow to back down and stay out of the area where the NANCY LYKES was operating. However, once the NANCY LYKES agreed and assented to the overtaking of it by the Canal Barge tow, then it was incumbent upon the NANCY LYKES to stay clear of the Canal Barge tow and to permit her to proceed upriver without any crowding, or embarrassment of its navigation by the NANCY LYKES. This is what the NANCY LYKES failed to do. The NANCY LYKES, instead of permitting the Canal Barge tow to operate in the river on its side, crossed the river because of the actions that its pilot and master were taking in an effort to avoid contact with the west bank and collided with the Canal Barge tow even though the Canal Barge pilot took all appropriate steps to attempt to avoid the collision.

The defendants would have us hold that both vessels are put on notice of special circumstances by a mere observation of the scene; that if it appears that one or both vessels are maneuvering that they do nothing else except go about their business and avoid colliding with one another. What the parties do if they are to pass one another during the maneuver, the defendants do not suggest. It cannot be the law in such a case that they stand mute and make no signals of any kind. In the Transfer No. 18, C.C.A.2d, 74 F.2d 256, cited by defendants, the court, after finding that the case was one of special circumstances, suggested that the vessel approaching the maneuvering ship could have blown passing signals and perhaps have avoided the accident. This is somewhat similar to the instant case. In this case JONES did blow the signal in a situation which was not as clearly a maneuvering or special circumstance case as the *Transfer No. 18* case. The Special Circumstance Rule does not preclude the use of signals. Indeed it fairly cries out for their use. Sometimes the only method by which one vessel can advise another that it is maneuvering is by the use of signals. The Special Circumstance Rule merely enjoins vessels to be on the lookout against last second extraordinary developments which *might* outlaw the use of other rules. The other rules may be used even when a vessel is maneuvering and when the maneuvering vessel assents to their use, as the NANCY LYKES did in this case, then each vessel may rely upon the other to abide by it.

Defendants cite several cases in support of their theory of the case. The first is Quantico-New England, 1941 A.M.C. 1776 (S.D.N.Y., not otherwise reported). In this case a tugboat was drifting dead in the water broadside in a main ship channel and was struck by a motor vessel coming up the channel. Finding a special circumstances situation the court held both liable, indicating that it was doubtful if either vessel used any signal at all. Since no signals were exchanged, the case is of little value in deciding the in-

stant case. But it is just as obvious that the court felt that an exchange of signals would have been beneficial even in these special circumstances. Defendant calls our attention particularly to the dicta in *Quantico-New England* to the effect that for the Overtaking Rule to apply that the NANCY LYKES would have had to be on a fixed course. First, I believe and hold that at the time the signals were exchanged that the LYKES was not on a fixed course, but whether it was or not is of no moment since LYKES acquiesced in the application of the Overtaking Rule by its answering blast. Even if it were a special circumstance situation does not mean that one vessel cannot go by another on a proper exchange of signals. Judge Borah in Arfeld-Lacune, 42 F.2d 745, found that special circumstances existed in a case where vessels exchanged signals. But he went on to say:

"While it was undoubtedly the duty of the Arfeld as the ascending vessel to give the first signal, still her failure to do so was not the proximate cause of the collision and did not give the Lacuna, as the descending steamer, the right to initiate passing signals, but, on the contrary, *it clearly was the duty of the Lacuna, according to pilot rule 1, to stop and back if necessary until signals for passing could be given and understood.*" (Emphasis added.)

So the Special Circumstance Rule may apply even when vessels are on set courses. Special circumstances sometime arise simply because proper signals have not been exchanged.

Defendant maintains that the exchange of blasts between JONES and LYKES were "meaningless" and that JONES should have interpreted the one blast return to mean that LYKES was maneuvering and that JONES "was to hold well onto her side of the river while the LYKES would continue her pivoting maneuver in the west side." This is a novel argument but even if LYKES had carried out her part of that bargain the accident would not have occurred.

The cases of Fort St. George-Olympic, 27 F.2d 788 (2nd Cir.); The Cedric, 2 Cir., 298 F.2d 959 (S.D.N.Y.); Cornell Steamboat Co. v. United States, an owner of the S.S. West Graing, 1924 A.M.C. 169; and President Hayes-American Eagle, 3 F.Supp. 717 (S.D.N.Y.) involved collisions between passing tows and ships backing out of slips. In each case the court pointed out that ships in these circumstances are at a disadvantage and the burden was on approaching vessels to stay out of the way until the backing vessel had completed its maneuver. In each instance the approaching vessel had not given the backing ship an opportunity to complete its maneuver and was thus at fault. In the instant case, the NANCY LYKES was maneuvering but gave every indication on the exchange of signals that it was either on a fixed course (in which case the Overtaking Rule would apply), or that a passage could otherwise be made safely. This was not true in any of the cited cases.

In Loveland v. Steamer Iowan et al., 1941 A.M.C. 557 (E.D.N.Y.), the facts appear to be similar to the instant case except there was no exchange of signals. The court held that since one ship was not on a set course, no passing signals were required. I simply don't agree that that is the law. Whether one of the ships is maneuvering or not, in order to eventually pass one another, signals will be necessary. An exchange of signals in the *Loveland* case, it appears to me, would have been helpful.

The case of United States Lines Co. v. the Ocean Vagrant (Chagres-Ocean Vagrant) 179 F.2d 495 (2nd Cir.), is not like our case because the approaching ship signaled twice to the maneuvering ship and received no answer. The court held simply that since it was maneuvering and not on a course it was not required to answer the signal and that the approaching ship, when it did not receive a return signal, should have slowed and altered course. The court did not indicate what the result might have been if the return blasts had been given, as was done in the instant case.

Gilmore and Black made the following comment concerning the Special Circumstance Rule:

"Courts, had they been so minded, could have sailed a whole armada of exceptions through the opening made by this Rule. Actually, it has been very narrowly construed, and will not excuse a violation of the plain mandate of the more specific Rules, merely because the navigator thinks it best to maneuver in some other way than in accordance with their provisions."

Gilmore and Black, The Law of Admiralty, p. 419.

Article 18, Rule V, of the Inland Rules provides:

"When steam vessels are moved from their docks or berths, and other boats are liable to pass from any direction toward them, they shall give the same signal as in the case of vessels meeting at a bend, *but immediately after clearing the berths so as to be fully in sight they shall be governed by the steering and sailing rules.*" 33 U.S.C. § 203 (Emphasis added.)

In the case of Clyde-Mallory Lines v. New York Cent. R. Co., 83 F.2d 158 (2nd Cir. 1963), Judge Learned Hand stated in his opinion:

"In determining the general application of the steaming rules, a 'steady course' does not mean an unchanging course, any more than it does as to holding one's course and speed. The last sentence of Rule V, Article 18, Inland Rules (33 U.S.C.A. § 203), assumes that the rules apply as soon as an emerging vessel begins to move on her way; its application in The Breakwater, 155 U.S. 252, 263, 264, 15 S.Ct. 99, 39 L.Ed. 139, was in no sense dependent upon the Pavonia's being a ferry. The Central tug here was no longer maneuvering to get on a course; her course began, not when she headed upstream, but as soon as she was clear to proceed. * * * "

■ LYKES although admittedly not having blown a danger signal itself, says the JONES is to blame for not having sounded a four-blast danger signal prior to the casualty. This contention is without merit since the emergency which was presented to the Master of the JONES was so sudden as to excuse him from blowing any danger signal. In the case of Arthur Smith Corp. v. Gulf States Marine & Mining Co., 258 F.2d 449, the Fifth Circuit in its opinion stated as follows:

"The failure to blow danger signals also brings into play the time element. The fact that the collision was not apparent until too late, through no fault of the Dawn, made the danger signal useless. It is the failure to give a danger signal when there is or should be an awareness of danger that constitutes statutory fault."

And further, in the case of Greenville Gravel Co. v. Illinois Farm Supply, 215 F.Supp. 560 (1963), the court in its opinion stated as follows:

"There is no duty to sound a danger signal when peril is discovered so late as to render a signal useless."

In any event I do not hold that JONES would have been without fault if, despite its exchange of signals, it had nevertheless encroached on the LYKES side of the river and interfered with LYKES' right to maneuver. But I find that the JONES maintained its position near to the east bank where it had every legal right to be and that the LYKES crossed the center of the river and embarrassed the JONES navigation and is therefore solely at fault in the collision.

■ There was no reason for those in charge of the JONES to anticipate the gross faults of the LYKES that led to the collision, and any doubts as to the navigation of the JONES should be resolved in their favor, as the major faults of the LYKES are alone sufficient to account for the collision, and any fault of the JONES tow in this matter I hold to be minor within the limits of the major-minor fault rule. Compania de Maderas v. Queenston Heights, 220 F.2d 120, 1955 A.M.C. 797 (5th Cir.); Danos v. Tug HENRY LOUIS, 159 F.Supp. 640;

White Stack Towing Co. v. Bethlehem Steel Co. (4th Cir.), 1960 A.M.C. 2294, 279 F.2d 419; Compania Nacional De Nav. v. Cabins Tanker Industries (4th Cir.), 285 F.2d 592.

The towboat JOSEPH JONES being free from fault, Canal Barge Company, Inc. is entitled to recover its full damages.

The WILLIAM SMITH being free from fault, a decree will be entered dismissing the libel as to it.

Attorneys for the parties will present appropriate decrees in accordance with the foregoing opinions. The matter will be referred to a commissioner in the event the parties cannot agree upon the damages sustained by Canal Barge Company, Inc. within sixty days from the date of said decree or, in the event of an appeal, the proceedings before the commissioner shall be held in abeyance awaiting action by the appellate courts.